HENRY A. BOOTH *et ux.*

*v.*

ANDREW M. WILEY *et al.*

*Filed at Ottawa November 10, 1881—Rehearing denied March Term, 1882.*

1. AMENDMENT *of bill in chancery—after the hearing—discretion.* Under section 37 of the Chancery Code the circuit court is invested with discretionary power to allow an amendment to a bill in chancery, on such terms as it may deem proper, after the hearing of the evidence, and arguments of counsel, and the announcement of its intended decision, but before any decree is signed and entered, and in the absence of evidence of an abuse of such discretion, its exercise is not the subject of review.

2. SAME—*of the proper terms to be imposed.* Such amendments will only be allowed when, or on such terms as that, no undue advantage will thereby be obtained over the opposite party, and upon payment of the costs occasioned thereby.

3. SAME—*whether affidavit required, as to grounds of application.* There is no necessity of an affidavit for the allowance of an amendment to a

bill after the hearing, when the court is satisfied that the evidence before it will make a case under a bill differently framed, and when such an amendment is allowed without affidavit it will be presumed the court was so satisfied.

4. EXTENSION OF TIME OF PAYMENT—*whether the agreement binding—consideration.* An assurance by the holder of a note secured by a deed of trust, or his agent, to the purchaser from the mortgagor, that if the latter would keep the interest paid there would be no sale of the property, the person to whom such assurance is given assuming no express liability to pay the interest, and there being no agreement on behalf of the holder of the note to extend the time of payment for any definite period, does not amount to a contract to extend the time of payment, and the payment of the interest being no more than the holder was entitled to, creates no valid consideration for a promise to extend the time of payment.

5. MORTGAGES—*as to time of sale under power in mortgage—rights of purchaser from mortgagor.* There being no privity between the purchaser of mortgaged premises and the holder of the note secured, and no recourse on him by the holder for any deficit on a sale of the premises under a power of sale, such purchaser will have no legal or equitable right to object as to the time when a sale is made after the debt has matured. Any indulgence granted by the holder of the note is a matter of grace only.

6. A clause in a deed of trust requiring the trustee to sell upon the request of the holder of the note secured, is purely for the benefit of the holder, to enable him to compel the foreclosure and sale, and not for the benefit of the maker of the note, or his assignee, and the inquiry by either whether the trustee acts upon the request of the holder of the note, after default, in making the sale, is not pertinent, especially when the foreclosure and sale have been ratified by the holder of the note.

7. SURETY—*exhausting mortgage security—rights of surety.* The surety upon a note secured by a deed of trust of the principal maker, after its maturity, has the right to demand that the real estate security be first exhausted for its payment, and neither the holder of the note, nor any one else, has the right to insist that the liability of the surety be extended without his consent, and the trustee, in the absence of the holder of the note from the country, may properly make the sale upon his request, and such surety will have the right to bid upon the property to protect himself from liability.

8. AGENCY—*whether it exists.* Where a party on the sale of property takes a note for the price, payable to his wife, and continues to look after its collection for her, putting the note in the hands of attorneys for collection, and doing all the correspondence with them, in his own name, in regard to its collection, he will be regarded as the agent and attorney of his wife, with power to authorize her attorneys to postpone the lien of her judgment, whereby a portion of the same is realized and the whole is ultimately collected, in the absence of evidence of anything on her part repudiating the act.

9. Same—*ratification by principal—acquiescence.* If the holder of a judgment, either by himself or acting through an agent, ratifies and adopts the act of his attorney in postponing the lien of his judgment to the lien of a subsequent deed of trust given by his debtor, such judgment creditor will be bound by the act, and such subsequent ratification with a knowledge of the facts is equivalent to a prior authority, and will validate the act of his attorney; and if he knowingly, by himself or agent, accepts the result or fruits of the arrangement made by his attorney postponing his judgment, and silently acquiesced, he will be bound; so, also, if, acting by himself or agent, he induces the party loaning to his debtor, and taking the trust deed, or the surety on his debtor's note, to believe, and they did believe, in loaning the money or becoming surety therefor, that the judgment creditor had authorized the postponement of his judgment, and the surety bought the property pledged by his debtor on the faith of such postponement of his lien, such judgment creditor will be bound by the postponement, and can not enforce his judgment as against the party so loaning to his debtor, or the surety.

10. A principal, if he intends to repudiate the act of his attorney, must do so promptly upon receiving knowledge of the same, and that others are acting upon the faith of it. If he does not, but soon after, with full knowledge of the facts, ratifies the act, and makes no objection for several years thereafter, when the rights of the parties have been materially changed on the faith of what has been done, he will not be allowed to make such repudiation, and neither will those who have purchased under him with notice of the facts.

11. Same—*notice to agent, when notice to principal.* Where a husband in procuring a sale under a judgment, and purchasing in the name of his wife, and for her, has notice that the lien of the judgment has been postponed to that of a deed of trust, executed subsequent to the judgment, this will be notice to his wife, and she will not be allowed to assert the title thus acquired by her to the prejudice of the purchaser of the land under the trust deed, and the adequacy or character of the consideration for the postponement of the judgment as to her will be immaterial.

12. Consideration—*whether necessary—where a third person acts on ratification by the principal of acts of agent.* Where the act of a party's attorney in postponing the lien of his judgment upon real estate has been ratified by himself or through his agent, or he has by himself or his agent induced another to make a loan on the security of the land, or one to become security for such loan, or has induced the surety to purchase the land at the trustee's sale of the land on the faith of such ratification, it is not material whether the postponement of his lien was upon a valid consideration or not. The want of consideration might have afforded reason for refusing to ratify the act of the attorney, but after electing to ratify it, others would have no right to question it for want of a consideration.

13. Same—*abandonment of claim—as a consideration for a promise.* The dismissal of replevin suits for the recovery of personal property levied

on under execution, so as to give the judgment creditor the first lien thereon, and enable him to realize its value on his judgment, is a valid consideration for an agreement to postpone the lien of the judgment as to one proposing to make a loan of money upon the security of the land so released from the lien of the judgment.

14. ALLEGATIONS AND PROOFS—*materiality of allegations—effect of a variance.* A variance between the allegations in a bill in chancery and the proofs, when not material as to the rights of the parties, or upon a point not affecting the merits, is not fatal to the relief sought, when it can be maintained upon other grounds.

15. Allegations which are of such character that the defendant can not properly inquire whether they have been proven, are not to be regarded as material.

16. FRAUD—*purchase on execution after postponement of lien of judgment.* The purchase of land under execution issued upon a judgment, after the making of an agreement on behalf of the judgment creditor postponing the lien of the judgment to that of a trust deed subsequently executed, on the same land, with full notice of such postponement, and setting up and claiming the title thus derived as superior and paramount to that derived under the trust deed, is, in legal contemplation, a fraud.

17. CHANCERY JURISDICTION—*bill to quiet title.* The rule that a bill to quiet title, and remove a cloud upon a party's title to land, lies only where the complainant is in possession of the land, or where he claims to be the owner and the land is vacant and unoccupied, applies only where the object of the bill is purely to remove a cloud from the title, and not where the primary relief sought is upon other and well established grounds, and the removal of the cloud is prayed only as an incident to that relief. The rule has no application where a deed is sought to be set aside upon the ground of fraud.

18. SAME—*to set aside deeds for fraud.* While a court of equity will not assume jurisdiction in every case of fraud which may be presented, yet there are few questions over which its jurisdiction is more universal, and especially so when it relates to the transfer of real estate.

19. RENTS AND PROFITS—*on refusal to surrender possession.* Where a party on demand refuses to surrender the possession of land, and on bill filed to set aside his title as fraudulently obtained, interposes an answer claiming to be the lawful owner, which claim proves to be unfounded, and thereby keeps the true owner out of possession, he is properly chargeable with the rents and profits of the land from the time of such demand and refusal.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. JOHN BURNS, Judge, presiding.

· At and prior to the transactions hereinafter referred to, Maston C. Scott was the owner of certain real estate in Peoria county, the location of which may be understood better by reference to the following plat or diagram, taken from the brief of defendants in error:

S. E. 20, 9, 5.

His property was incumbered as follows, which statement is also taken from the brief of defendants in error, but which has been verified, and in one respect corrected:

*First*—February 1, 1870, by warranty deed of Scott and wife to Henry Page, for the south half of said south-east quarter.

*Second*—March 1, 1870, by warranty deed of Scott and wife to James Venn, for said part of said south-west quarter.

*Third*—On same day, by warranty deed of Scott and wife to Gustavus Vandersloot, for the north half of said south-east quarter.

*Fourth*—April 9, 1870, by warranty deed by said James Venn to Joseph Wiley, for said part of said south-west quarter, so conveyed to him as aforesaid by Scott and wife.

*Fifth*—December 21, 1870, by mortgage of Scott and wife to William Criger, upon the south half of said south-east quarter, and part of the south-west quarter, to secure a note of $810.33.

*Sixth*—May 8, 1871, by mortgage of Scott and wife to William Criger, upon the whole of said south-east quarter, and said part of said south-west quarter, to secure the

same indebtedness last aforesaid, with some accrued interest, amounting in all to $840.34.

*Seventh*—February 8, 1871, by warranty deed of Scott and wife to Isaac Hurff, for said north half of said south-east quarter.

*Eighth*—March 8, 1871, judgment of the circuit court was rendered in favor of Elizabeth Mumma, against said Scott, for $663.83, upon which execution had been issued within a year, and levy made upon a crop of corn (1600 bushels) raised by Scott on the lands aforesaid. The corn had been sold on the execution, and bid off by T. Cratty, as attorney for Mumma, and put in store at Elmwood, and said Isaac Hurff, claiming that he was owner of the land by virtue of his warranty deed,—that Scott was his tenant, and the corn belonged to him as rent,—had, on November 16, 1871, seized the corn upon a writ of replevin, issued from the circuit court, in his own favor, against Scott. To this suit Scott had pleaded title in Cratty and in Mumma, by virtue of the purchase at the execution sale. Then, December 30, 1871, said Cratty brought replevin in said court against said Hurff, and seized the said 1600 bushels of corn. Both these replevin suits were pending March 1, 1872.

*Ninth*—November 30, 1871, mortgage of Scott and wife to William Dixon, to secure $483, upon said part of said south-west quarter.

*Tenth*—August 22, 1871, William Criger filed in said court a bill to foreclose his said mortgages, making defendants said Scott, said Hurff, said Vandersloot, said Venn, and said Joseph Wiley, charging that said Scott's said warranty deeds were in fact only mortgages, and said deed from Venn to Joseph Wiley only an assignment of a mortgage; alleging, also, notice and conspiracy, and praying for an account and foreclosure. This suit was also pending March 1, 1872.

According to the evidence of Scott, and in this he is corroborated by the evidence of E. Johnson, Thomas Cratty,

and, perhaps, others, he proceeded, with the consent and approbation of his creditors, to make arrangements to get money to get these liens off, and on the 2d of February, 1872, he and Isaac Hurff entered into a contract, as follows:

"In the case of *Criger* v. *Scott, Hurff et al.,* as a proposition of compromise, the said Hurff hereby agrees to accept and take from the said Scott the amount of money which he has actually loaned to said Scott, with ten per cent interest, and $300 in addition, which $300 is to be paid in lieu of the interest being compounded annually, and the said Scott hereby agrees to pay said amount in the manner above stipulated. If parties can not agree upon the amount due, the same shall be ascertained by reference to the master in chancery. This settlement is to include all subjects of litigation between the parties.

"In case this settlement shall be completed, said Hurff shall reconvey and release any and all property he may have of Scott, or have, or pretend to have, any claim upon of Scott, and pay all costs of the proceedings in reference thereto, not including attorney's fee, but court costs in this and two replevin suits,—this agreement to be filed and embodied in a decree of court at the present term of court. In case the real estate claimed by Hurff shall not, at the master's sale thereof, sell for the amount found to be due to said Hurff by said decree, then, in such case, nothing herein contained shall be construed to affect, in any manner, any lien he (Hurff) has, or may pretend to have, upon any of said Scott's personal property.

"The decree to be made herein shall be for the following amount, as agreed upon between them: $3782.82, with interest from this date, at six per cent.

"PEORIA, *February 2, 1872.*"

On the 1st day of March, 1872, William Criger executed and delivered to John G. Miles and Benjamin F. Miles a

deed postponing and deferring the lien of his mortgages, and making them subsequent and subject to a trust deed that day to be acknowledged by Maston C. Scott and wife to Benjamin F. Miles, in trust for John G. Miles, to secure the payment of a note of that date to John G. Miles, for $4600, in said deed described. The consideration of this was $700, received from them by Criger, to apply on his mortgages. On the same day (March 1, 1872,) the following was executed, and delivered to John G. Miles:

"*John G. Miles and Benjamin F. Miles:*

"GENTLEMEN—The undersigned, attorneys in fact of Elizabeth Mumma, and attorneys of record in her behalf, understanding that you propose to make a loan to Maston C. Scott, and take security therefor by way of trust deed upon the south half of the south-east quarter of section 20, and a part of the east half of the south-west quarter of section 20, in township 9 north, and range 5 east, in the county of Peoria, and that your said trust deed will bear date March 1, 1872, and be delivered this day, and being desirous for a settlement of affairs of said Scott, in which all his, said Scott's, creditors are interested, and in consideration thereof, hereby agree to postpone and make subsequent and subservient to the lien of said trust deed, all the lien of a judgment in favor of said Elizabeth Mumma against said Scott, for the sum of $633.83, in the circuit court of Peoria county, on the 8th day of March, A. D. 1871, upon the said south-east and south-west quarters of section 20, aforesaid, and that said lien of said trust deed shall take precedence of the lien of said judgment.

CRATTY, BOHL & CRATTY.

THOMAS CRATTY,

Attorney for Elizabeth Mumma,

plaintiff in said judgment.

March 2, 1872.

Filed for record March 5, 1872."

On the same day, but afterwards, John G. Miles loaned Maston C. Scott $4600, payable in five years, with interest at ten per cent, semi-annually, in advance, and took the promissory note of said Scott and Andrew M. Wiley therefor,— Andrew M. Wiley being in fact surety thereon for Scott. To secure the payment of this note, Scott and wife executed and delivered .to Benjamin F. Miles, trustee of John G. Miles, a deed of trust upon the south half of the south-east quarter of section 20, town 9, range 5, and part of the south-west quarter of said section, therein particularly described, and as shown by the diagram of Scott's land, *supra.* The deed provides, that "in case of default in the payment of said note, or the interest, according to .the tenor and effect of the note, the whole of· the note shall become due and payable, and on the application of the legal holder of the note, the trustee, after having duly advertised the sale, shall sell said premises, and all the right and equity of redemption of the grantors, their heirs and assigns." With the money thus obtained Scott paid off the claims of Henry Page, Joseph Wiley, William Dixon, and the $700 on .the mortgages of Criger, and thus disincumbered the south half of the south-east quarter, and the part of· the south-west quarter, leaving the Miles deed of trust prior, as a lien upon that property,—said Page and Wiley having previously agreed to treat the respective deeds, under which they claimed, as mortgages, and they each, upon the receipt of payment of their claims, reconveyed all their title to this property to Scott, and the mortgage of said Dixon was also released to Scott. For the balance of his claim—$209.30—Criger took a confession of judgment on the 9th of March, 1872. On the 14th of March, 1872, Hurff filed his cross-bill to the bill filed by Criger to foreclose, admitting therein that his deed was but a mortgage, and asking for a foreclosure for the amount agreed between himself and Scott to be due, as ·shown by the instrument witnessing their settlement and agreement, *supra,*

being $3782.82, and also alleging therein that Criger assented
to this stipulation.  On the 26th day of June, 1872, Van-
dersloot (or rather Hurff, who had purchased his claim,
acting in his name,) filed a cross-bill to the Criger bill for
foreclosure, admitting that his deed also was but a mortgage,
and praying for a foreclosure.  The other defendants to the
Criger bill, having been paid, and their claims satisfied, made
no defence.  Issues were formed on the cross-bills, and the
cause was subsequently heard, and decree rendered directing
the sale of the said north half of the south-east quarter for
the payment of the Hurff and the Vandersloot claims.  In
pursuance of the decree the master advertised the property,
and sold it to Hurff for $4900, and he took a personal decree
against Scott for the balance of his claim—about $300.
There being no redemption from this sale, the master exe-
cuted a deed to Hurff for the property, on the 3d of April,
1874.  The two replevin suits were dismissed at Hurff's
costs, subsequent to the sale, on December 4, 1873.  After-
wards, the corn was sold and the proceeds—$421.25—applied
on the judgment in favor of Elizabeth Mumma against Mas-
ton Scott.

On the 11th of March, 1874, Scott sold the property em-
braced in the Miles trust deed to Henry A. Booth, for $468,
in money and property, and conveyed the same to him by
warranty deed.

John G. Miles died intestate, September 27, 1877, leaving
as his heirs at law Benjamin F. Miles, E. H. Miles, and Mrs.
Julia Dorris, intermarried with William Dorris.  The note of
Scott was assigned by Benjamin F. Miles and E. H. Miles to
Mrs. Dorris, on the 28th of December, 1877.  On the 27th
day of December, 1878, the property was sold by the trustee
under the power in the deed of trust, and bid in by Andrew
M. Wiley for $4000, and deed was executed to him therefor.

The judgment in favor of Criger, and against Scott, not
having been paid, summons of garnishment was served upon

Booth, and thereafter it was paid pursuant to a contract, as evidenced by the following instrument in writing:

"Peoria, Ill., *February 18, 1875.*
"*Criger* v. *M. C. Scott*—Garnishment of ·H. A. Booth.

"It is agreed, in settlement of matters involved in the above suit, that Booth is to assign and deliver to Criger a certain note for $162.50, with interest thereon at ten per cent, since January 1, 1874, executed by Jacob and Angelina Frye to Criger's property. Scott is to give to Criger a note, secured by the name of William Scott or William Ewalt, due May 10, 1875, for the sum of $40 and the costs of this suit, drawing interest at ten per cent, in payment of the balance due from said Scott to Criger. Papers and notes to be delivered within one week from the 15th inst.

M. C. Scott,<br>H. A. Booth,<br>N. Criger."

On the 23d of February, 1875, execution was issued upon this judgment, notwithstanding it had been paid, and levied on the lands in controversy (being the same described in the deed of trust, and purchased by Wiley,) on the 26th of the same month. On the 30th of March, 1875, the lands thus levied upon were sold by the sheriff to Thomas Cratty, to whom a certificate of purchase therefor was then delivered. Cratty assigned the certificate to William Jack, and the sheriff executed a deed to him on the 27th day of July, 1876. An *alias* execution was also issued on the judgment, in favor of Elizabeth Mumma, and against Scott, and levied upon the same lands on March 9, 1875, and on the 30th of March, 1875, they were also sold by the sheriff under this levy, to Thomas Cratty, for $350, and a certificate of purchase was then issued to him therefor, and this certificate was likewise assigned by him to William Jack, and the ·sheriff executed to said Jack a deed for said lands on the 20th of

January, A. D. 1879, and on the same day the said Jack quitclaimed all his interest in said lands to Sarah I. Booth, by direction of H. A. Booth.

Demand was made in writing, by Wiley, for possession of these lands, upon both Henry A. Booth and Sarah I. Booth, on the 19th of March, 1879, and they each refused to surrender the same. Wiley commenced an action of forcible entry and detainer for the possession of the lands against Henry A. and Sarah I. Booth, before a justice of the peace of Peoria county, and recovered a judgment. The Booths appealed from this judgment to the circuit court of Peoria county, and pending the hearing of that case Wiley filed his bill in chancery against Henry A. and Sarah I. Booth, in the same court, praying that the title of Sarah I. Booth, derived by the quitclaim from Jack, be declared fraudulent and void, and set aside, and that the defendants be enjoined from setting up the same as a defence in the forcible detainer suit, that they be required at once to surrender possession of said premises, and that an account be taken of the rents and profits, and for general relief. The defendants answered, and Henry A. Booth filed his cross-bill, charging fraud, conspiracy, etc., in the sale under the trust deed, and praying that the sale be set aside, and the deed of Wiley declared void, etc.

Answers were filed to the cross-bill, and the cause was heard on original and amended bills, cross-bill, answers to original and cross-bills, and proofs, and the court thereupon found the facts substantially as alleged in the original bill, and against the allegations of the cross-bill, and decreed that the cross-bill be dismissed and the prayer of the original bill be granted. It was specially found that said Elizabeth Mumma and William Criger judgments against Maston C. Scott, the executions, levies and sales under each of them, and the sheriff's certificate to Thomas Cratty upon each of said sheriff's sales, deed to William Jack, assignee of Thomas

Cratty, and deed of William Jack to Sarah I. Booth, convey and vest no title in the premises in controversy as against the title of Andrew M. Wiley, the complainant, and the deeds are decreed to be set aside and canceled, as against the title of said complainant. The court also found that the use and occupation of the premises by the defendants, since the demand for possession, were reasonably worth $960, for which amount, after deducting $37.92 for taxes paid, or $932.08, decree was rendered.

The present writ of error is sued out to reverse that decree. Other facts material to the understanding of the case sufficiently appear in the opinion. Numerous errors are assigned, all of which are, however, comprehended within the points discussed in the opinion.

Mr. John Muckle, for the plaintiffs in error:

Booth not being in possession, has a complete remedy at law to recover possession of the premises. Rev. Stat. 1874, chap. 57, sec. 2; *Rice* v. *Brown,* 77 Ill. 549; *Hinterberger* v. *Weindler,* 2 Bradw. 407.

This jurisdiction can not be removed or transferred to a court of equity on the pretense of removing clouds from titles. *Phelps* v. *Harris,* 101 U. S. 370.

Those only who have a clear legal title connected with possession, have any right to claim the interference of a court of equity to give them peace or dissipate a cloud on the title. *Orton* v. *Smith,* 18 How. 263; *Overing* v. *Foote,* 43 N. Y. 290; *Hardin et al.* v. *Jones,* 86 Ill. 315.

A court of law is the proper tribunal for the adjudication of legal titles, and it is only in extraordinary cases that a court of chancery will assume the trial of such titles. *Alton Marine and Fire Ins. Co.* v. *Buckmaster,* 13 Ill. 201; *Comstock et al.* v. *Henneberry,* 66 id. 212; *Smith* v. *McConnell,* 17 id. 135; *Shays* v. *Norton,* 48 id. 100.

A court of equity will not always assume jurisdiction, where the complainant is out of possession, to remove a title as a cloud, even where the defendants have been guilty of fraud. *Burton* v. *Gleason,* 56 Ill. 25; *Emery* v. *Cochran et al.* 82 id. 65; *Wing et al.* v. *Scherer,* 77 id. 201.

To establish the validity of the pretended release or postponement, it is claimed that Mr. Cratty, who made it, was Mrs. Mumma's attorney of record in the suit; but an attorney of record has no power, by virtue of his general authority, to release his client's judgment. *Dollar Savings Bank* v. *Robb,* 4 Brewst. 106; *Harrow* v. *Farrow,* 7 B. Mon. 126; *Wadhams et al.* v. *Gay,* 73 Ill. 426; *Nolan* v. *Jackson,* 16 id. 273; *Miller* v. *Edmunton,* 8 Blackf. 291; *Wilson* v. *Wadleigh,* 36 Me. 496; 1 Wade on Actions and Defences, 442, 435.

The court of law having first obtained jurisdiction for the purpose of determining the rights of the parties to the possession of the premises in controversy, should have been allowed to retain the case at least for that purpose, and the court erred in not leaving the parties to try the right to the possession as well as the validity of the titles to the court of law. *Wells* v. *Lamay,* 88 Ill. 174; *Rockwell et al.* v. *Servant et al.* 54 id. 252; *Mason* v. *Piggott,* 11 id. 85; *Ross* v. *Buchanan,* 13 id. 59.

Mr. H. B. HOPKINS, and Mr. W. W. HAMMOND, for the defendants in error:

When the adverse title sought to be set aside as a cloud is a title fraudulently acquired, equity has jurisdiction, although the complainant be not in possession. *Kennedy et al.* v. *Northup et al.* 15 Ill. 148; *Redmond et al.* v. *Packenham et al.* 66 id. 434; *Comstock* v. *Henneberry,* id. 212; *Hodgen et al.* v. *Guttery,* 58 id. 431; *Moore* v. *Munn et al.* 69 id. 591; *Emery* v. *Cochran,* 82 id. 65.

A court of equity will remove clouds cast upon titles by the fraudulent acts of parties, whether they be strong or

weak, from the title paramount in law, down to those which are absolutely void on their face. *Fitts et al.* v. *Davis et al.* 42 Ill. 391; *Gage* v. *Rohrback*, 56 id. 262; *Tucker et al.* v. *Conwell et al.* 67 id. 552; *Reed* v. *Reber et al.* 62 id. 240; *Redmond* v. *Packenham*, 66 id. 434.

The release was valid and effective in equity, though Cratty may have had no written special power of attorney from Mumma to execute it—

*First*—Because Cratty, as Mumma's attorney of record, and specially authorized agent to manage and handle said judgment, as her interests might require, had all necessary authority to make said postponement.

*Second*—Because Elizabeth Mumma, and her husband and agent, acquiesced in said release for years, and until the death of each of them.

*Third*—Because the Mummas received the consideration for said release, and thereby ratified it, whereby they are estopped from repudiating it and retaining the benefits.

The note being overdue more than two years, Wiley, as surety, had the right to require the trustee to make the sale, and such was not fraudulent. *Warner* v. *Crane*, 20 Ill. 148; *Gilbraith* v. *Fullerton*, 53 id. 156; *Danforth et al* v. *Semple et al.* 73 id. 170; *Myers* v. *First National Bank*, 78 id. 257; *Crossman* v. *Wohllenben*, 90 id. 537.

It is also urged by the plaintiff that relief can not be granted in this case because a suit for forcible detainer was pending between Wiley and the plaintiff when it was commenced. Such suit is no bar as to equities the court had no jurisdiction to try. *McCartney* v. *McMullin*, 38 Ill. 237; *Smith* v. *Hoag*, 45 id. 250; *Brooks* v. *Bruyn*, 18 id. 539; *Johnson* v. *Baker*, 38 id. 98; *Thompson* v. *Sornberger*, 59 id. 326; *Huftalin* v. *Misner*, 70 id. 205.

Courts of equity have a discretionary power to allow amendments, upon reasonable terms, at any stage of the case up to recording its decree upon the merits, and their

discretion is ordinarily not the subject of review. *Turner* v. *Berry,* 3 Gilm. 546; *Martin* v. *Russell,* 3 Scam. 342; *Seward* v. *Wilson,* 1 id. 191; *Jefferson Co.* v. *Ferguson et al.* 13 Ill. 33; *Moshier* v. *Knox College,* 32 id. 156; *Mason et al.* v. *Bair,* 33 id. 194; *Marble* v. *Bonhotel,* 35 id. 240; *Hancock* v. *Durand,* 42 id. 230; *Hewitt et al.* v. *Dement et al.* 57 id. 500; *Gregg* v. *Brower,* 67 id. 525; *Lyndon* v. *Lyndon,* 69 id. 43; *Braum* v. *Bragg et al.* 70 id. 283; *Bliss* v. *Harris et al.* 70 id. 331; *March* v. *Mayers,* 85 id. 177; *DeWolf* v. *Pratt,* 42 id. 198; *Trust and Fire Ins. Co.* v. *Jenkins,* 8 Paige, 589; *Bowen et al.* v. *Idley,* 6 id. 46.

Mr. Justice Scholfield delivered the opinion of the Court:

Before proceeding to the questions affecting the merits of the controversy, as presented by the record, it is necessary to pass upon a question of practice.

At the May term, 1880, a hearing was had, both parties introduced all the evidence they then desired to introduce, arguments of counsel on the respective sides were heard, and the court announced what would be its decision, and directed the solicitor for plaintiffs in error to draw up a decree in accordance therewith. Before any decree was signed or entered, the solicitor for the complainant in the original bill moved the court for leave to file an amended bill in said cause. The motion was allowed, over the objections of the solicitor of the plaintiffs in error, and time given until the 20th of September, 1880, within which to file such amended bill. No affidavit was filed in support of the motion.

This is clearly no ground of error. The court is specially invested with power, by statute, to allow amendments to be made to bills, pleas, answers and replications, on such terms as it may deem proper. Chap. 22, Rev. Stat. 1874, title "Chancery," sec. 37.

In *Jefferson County* v. *Ferguson et al.* 13 Ill. 33, four amendments were allowed to the bill, two of which were after

the case had been argued, and while it was under advisement
in the circuit court, and it was held this was not error, but
that it was within the discretion of the court.    In *Mason et al.*
v. *Bair,* 33 Ill. 194, it was held not to be error to allow the
bill to be amended after replication filed and the cause sub-
mitted upon the evidence.    And in *Marble* v. *Bonhotel,* 35 Ill.
240, the complainant was allowed to amend his bill after
answer filed, proofs taken, and a motion made to dissolve the
injunction, and it was held not to be erroneous.    The princi-
ple that such amendments are purely discretionary, and
ordinarily, and in the absence of evidence of an abuse of a
reasonable discretion, not the subject of review, is too well
settled to justify argument or extended comment.    See, also,
*Hewitt et al* v. *Dement et al.* 57 Ill. 500 ; *Lyndon* v. *Lyndon,*
69 id. 43 ; *March* v. *Mayers,* 85 id. 177.    Such amendments
must, of course, only be allowed when, or on such terms as
that, no undue advantage will thereby be obtained over the
opposite party, and upon payment of costs thereby occa-
sioned.

It is impossible to see how plaintiffs in error were here, in
any substantial manner, prejudiced by the amendment that
was allowed, since they can properly claim no right to have
the case disposed of in any other way than according to the
actual equitable rights of the parties, and the court decreed
the payment of $30 costs, in consequence of allowing the
amendment.    There was no necessity of an affidavit, if the
judge believed that the evidence then before him would make
a case under a bill differently framed, as he doubtless did,
and as we are to assume he did, from his act.

The question first to be considered on the merits of the
controversy, as presented in argument, is, can the sale to
Wiley, under the trust deed, be sustained?    It is assailed by
counsel for plaintiffs in error upon the ground, first, that
there was a contract between the holder of the note and
Booth that the loan should run as long as Booth should

promptly pay the interest; and second, that the trustee ad-
vertised and sold, without any previous request of the holder
of the note, but solely upon the request of Wiley, with whom,
it is charged, he conspired to wrong and defraud Booth.

The evidence, in our opinion, fails to support either of
these propositions. The note, it will be remembered, was
executed by Maston C. Scott and A. M. Wiley (Wiley being,
in fact, surety for Scott,) to John G. Miles. John G. Miles
died subsequently, and by an arrangement thereafter made
between his heirs at law, this note became the property of his
daughter, Mrs. Julia M. Dorris, the wife of William Dorris.
Dorris and his wife resided at Huntingdon, Pennsylvania,
and they were in Europe from in May until in October,
1878. There is no pretense of a contract for an exten-
sion of time with John G. Miles, and Mr. and Mrs. Dorris
explicitly deny that any such contract was ever made with
them, or either of them. For convenience, while Dorris and
wife were in Europe, Mrs. Dorris left the note and deed of
trust in the hands of one Garretson, who resided at Hunting-
don, and he, together with F. O. Cunningham, to whom Gar-
retson subsequently sent the note, and her brother, B. F.
Miles, the trustee in the deed of trust, residing in the vicinity
of the property in controversy, in this State, were to act, and
did act, as her agents, with full power (orally conferred) to
act, in regard to the note and deed of trust, (whether to col-
lect by foreclosure and sale, or otherwise, or to leave the
debt standing,) as they should think the best for her inter-
ests. Now, Booth himself denies that he, in his contract
with Scott, assumed the payment of this note, and he makes
no claim to having subsequently assumed such an obligation.
All that he claims is, that by assurances from Dorris, before
Dorris and wife sailed for Europe, and by Cunningham while
Dorris and wife were in Europe, he was induced to believe
and act upon the assumption that if he kept the interest on
the note promptly paid there would be no sale of the prop-

erty. But this did not amount to a contract. Booth assumed no express liability to pay the interest. There was no agreement on behalf of the holder of the note that time of payment should be extended to any designated period. Payment of interest due was no more than the holder of the note was entitled to in any contingency, and there was, therefore, no valid consideration to support a promise to extend definitely the time of payment, even if such a promise had been made. It would have been strange, indeed, if Dorris, himself a lawyer, or Cunningham, without specific and ample power in that regard, had made a valid and binding contract, without the consent of Wiley, (which no one pretends was ever obtained,) to extend the time of payment, for, under repeated decisions of this court, the effect of such a contract would have been to release Wiley from further liability.

Upon the other question it is difficult to see how Booth is concerned. He claims that he assumed no liability. His counsel say he bought the right to use the property until foreclosure under the deed, and the privilege to redeem afterwards. Whether this, therefore, was worth much or little, concerned only him. He might let the property go at whatever should be bid for it at the sale, and there would be no recourse for a balance against him. As between him and the holder of the note there was no privity whatever. After the note was due it was of consequence to no one, in a legal point of view, but the holder, *when* the property should be advertised and sold. In the very nature of things Booth had no legal or equitable right in the matter. If the property should be advertised and sold promptly, upon default, Booth could not object. If not thus advertised and sold, and he should be permitted to enjoy the property for months or years longer, this would be by grace and favor, and not by legal or equitable right to require that it must be so.

The clause requiring the trustee to sell upon request of the holder of the note is manifestly purely for the benefit of the

holder of the note, to enable him to control the foreclosure and sale, and not for the benefit of the maker of the note. When the maker is in default he has no further legal or equitable claims to indulgence, and much more must this be so as to a mere outsider, as Booth here claims to be. But if it were pertinent for Booth here to inquire whether the trustee acted, in making the sale, upon the request of the holder of the note, we think the evidence is ample that he did.

The question of the collection of the note by foreclosure and sale, or otherwise, or of continuing the loan, having been left to the determination of Garretson, Cunningham, and the trustee, Miles, during the absence of Dorris and wife in Europe, they determined that her interests required that the property should be sold, and the sale was accordingly made. This act she has always ratified and approved, and she still does ratify and approve it, and that, in our opinion, is sufficient for any and every purpose.

But it is claimed that the sale was induced through the false representations of Wiley. Since it did not take place before the contract of the parties authorized that it should take place, and Booth has failed to show either a legal or equitable right to have had it postponed, it is impossible to see how, in a legal point of view, this can concern him. The mere prevention of the extending of an act of grace or favor, or the conferring of a bounty expected and promised, has never been known to form the basis of legal or equitable relief. Courts can deal only with obligations recognized as legally or equitably binding upon parties, and not revocable or enforceable simply at the whim or caprice of the party from whom they are expected to emanate.

But we see no ground in the evidence to censure Wiley's conduct, even if his motives were a proper subject of investigation. It is not shown that he knew what he said about the depreciation of the value of the property to be false. Others may honestly have thought the property was not

badly managed and kept up, and he, with equal honesty, may have thought the contrary. He was but surety on the note, and he had the right to demand that the real estate security be exhausted for its payment. The note was due, and neither Booth nor any one else had the right to insist that his liability be extended, without his consent. In urging the sale he did what, under the circumstances, most prudent men would doubtless have done, and most certainly what he had a legal right to do, and the agent and trustee properly acted upon his request. Moreover, it was to his interest to make the property bring as much as possible,—at least to the full amount of the debt and interest,—at the sale. He was a competent bidder, and, no one bidding higher, might lawfully become the purchaser of the property.

The question next presented in argument is, whether there is a substantial variance between the allegations and proofs, and under this head counsel for plaintiffs in error urges several specific objections. First, he says it is alleged that Thomas Cratty released or postponed the lien of the Mumma judgment against Scott, rendered March 8, 1873, for $663.83, and costs, to the lien of the Miles trust deed, and that Cratty had a power of attorney from Mrs. Mumma authorizing him to make such release, etc., whereas, he insists, the evidence fails to show that Cratty had a power of attorney from Mrs. Mumma authorizing him to make such release or postponement, or that he assumed to make the same.

The last, or third, amendment to the bill expressly shows that proof of the execution of the power of attorney to Cratty authorizing him to postpone or release the Mumma judgment could not be made, and it is therein then averred, as shown by the abstract of plaintiffs in error, as follows:

"Complainant avers, on information and belief, that Thomas Cratty did, with the knowledge and consent of Mrs. Mumma, and by her oral authority, execute and deliver the said postponement or release in her name and on her behalf, and said

Booth had full knowledge of said facts; that Mrs. Mumma
ratified, accepted and adopted said act of Cratty, by acqui-
escence in the same for many years after the fact was known
to her, and, being a married woman, all her business in con-
nection with the transaction was done by her husband, David
Mumma, with her knowledge and consent, and he ratified
and adopted said release by acquiescence therein for many
years; that Mrs. Mumma ratified and adopted the release
and postponement by accepting and receiving gains and bene-
fits derived by means of, and in consideration of, the same, in
this: Said judgment became a lien on Scott's estate March
8, 1871. Scott then held the fee in all the lands in contro-
versy in this suit, and the north half of said south-east
quarter of section 20. All these lands were subject to heavy
liens prior to the lien of the Mumma judgment, viz: a
mortgage in favor of Isaac Hurff, for $1000, dated about
February 8, 1868; a mortgage to Gustavus Vandersloot, for
$1130, dated March 1, 1870; a deed, but in fact a mortgage,
to Henry Page, for $2000, dated about March 1, 1870; a
deed, but in fact a mortgage, to Isaac Hurff, for $3000, dated
February 8, 1871; a deed, but in fact a mortgage, for $500,
all made by Scott prior to the rendition of the Mumma judg-
ment, so that without redeeming from very heavy prior liens
said judgment could not be enforced against any of the lands
of Scott. Scott also then had, or claimed title to, a large
quantity of corn grown or growing upon said land, and an
execution issued on the Mumma judgment had been levied
on the same, and some three or four replevin suits were in-
stituted, challenging the right of Mumma to convert the corn
to pay her judgment. A bill was then pending to foreclose
one or more of said mortgages. At this juncture, Scott, with
the aid and concurrence of his creditors, undertook to remove
all the said incumbrances on the south half of said quarter
section, and said 40-acre tract, by allowing a decree of fore-
closure as to the north half, and by borrowing enough of

Miles on said south half and 40-acre tract to disincumber them. To enable Scott to do this, said creditors executed such contracts and releases as were necessary to make Miles a first lien for the money borrowed, and on Mrs. Mumma's behalf said release or postponement was so executed by said Cratty, and by it said Mumma took the benefit of all, or nearly all, of said liens and incumbrances prior to her said judgment, and she, or those claiming under her, have ever since enjoyed it, and by reason of the same arrangement and loan she derived further gain. The said adverse claims to the corn were settled and withdrawn, and the replevin suits dismissed, and the corn converted and credited on her said judgment to the amount of over $400."

Enough of these allegations are, in our opinion, substantially proven to authorize the decree that was rendered. If Mrs. Mumma, either by herself or acting through her agent, ratified and adopted the act of Cratty in postponing the lien of her judgment to that of the Miles' trust deed, she is barred. In such case, the subsequent ratification is equivalent to a prior authority, and validates what was done, though at the time it was done it was without authority; and if she, knowingly, by herself or agent, accepted the result or fruits of an arrangement made by Cratty postponing her judgment, and silently acquiesced, she is barred. So, also, if, acting by herself or her agent, she induced John G. Miles or A. M. Wiley to believe, and said Miles did believe in loaning said money, or said Wiley did believe in signing said note as surety, or in purchasing said property at the trustees' sale, that she had duly empowered said Cratty to postpone the lien of her judgment to that of the trust deed, she is barred.

This judgment was for indebtedness contracted by Scott in purchasing hogs from David Mumma, but Scott, at the request of David Mumma, gave his note payable to Mumma's wife, Elizabeth. David Mumma, however, continued to be the only actor in regard to its collection. He and his wife

were non-residents. He placed the claim in the hands of attorneys, and did all the corresponding in his own name in regard to its collection. He must, therefore, in all that relates to the collection of the judgment, be regarded as the agent and attorney of Elizabeth, his wife. As a direct result of the agreement to postpone the lien of this judgment to that of the Miles deed of trust, David Mumma received, as the proceeds of the sale of certain corn levied upon, $421.25, and, ultimately, the balance of the judgment. There is no evidence that either Mrs. Mumma, or any one on her behalf, repudiated the conduct of Cratty in postponing the lien of her judgment. Upon the contrary, it is shown by the testimony of Scott, that in a conversation between Scott and David Mumma, after the execution of the instrument by Cratty purporting to postpone the judgment, and after the money had been realized from the sale of the corn, Scott told David Mumma that Cratty had agreed to a postponement of the judgment, in order that he (Scott) could obtain the loan of Miles, and that he asked Mumma if he had got his $400. Mumma replied that he had not. Scott then told him he had deposited $400 with Phelps, and that he would pay him the balance as soon as he could. Mumma then said: "I think you might have got enough more money to have paid my claim off." Scott told him they had got all they possibly could get, to which Mumma replied that he would not be hard,—that he had left his business with Cratty, and whatever Cratty did with his business was all right with him. Standing, as this does, uncontradicted, it would seem to be sufficient proof of a knowledge of Cratty's act in assuming to postpone the lien of the judgment, and a complete ratification of it.

But it is contended the proof fails to show any consideration for postponing the judgment. If the instrument executed by Cratty has been ratified by Mrs. Mumma, by herself or through her agent, or if she, by herself or her agent,

has induced action, either by John G. Miles in making the loan, or Wiley in signing the note or purchasing at the trustee's sale, on the faith that she had so ratified, it is not material whether the postponement was based upon a valid consideration or not. Mrs. Mumma might, for that cause, refuse to ratify Cratty's act, but electing to ratify it, others could have no interest in the question. The circumstance that there was no consideration would, undoubtedly, in the absence of clear and decisive proof of a ratification, be one of importance in determining whether there was in fact a ratification. The evidence is not very full and explicit as to what was the consideration supporting the promise to postpone. The motive is clearly enough proven to have been to disincumber the south half of the south-east quarter, and the part of the south-west quarter, so that Miles could, by his trust deed, acquire a first lien thereon as security for the loan of the $4600; but precisely how this benefited Mrs. Mumma is not so clear. We are, however, inclined to think that a fair consideration of all the evidence warrants the conclusion that the dismissing of the replevin suits and abandonment by Hurff of his claim to the corn, so as to give Mrs. Mumma the first claim to the corn, and enable her to realize the amount of its value upon her judgment, was a part of the same transaction by which the lien of her judgment was postponed, and so the promise was supported by a sufficient legal consideration.

But, in our opinion, little stress need be laid upon this view. It is only important here to inquire whether such allegations as affect the rights of these parties have been substantially proven—whether allegations as to questions in regard to which they are not allowed to make inquiry have been proven or not, is wholly unimportant. The evidence shows, with sufficient fullness, that Miles, in making the loan, supposed that the instrument executed by Cratty postponed the lien of the Mumma judgment. The whole tenor of the

evidence shows this, and there is nothing to the contrary. Wiley swears that when he signed the note he did so as guarantying the land was ample security for the amount of the loan. When he urged the trustee to sell, it was because he alleged the land was becoming inadequate security, and the bid that he made at the trustee's sale, inferentially appears to have been predicated upon the idea that he was purchasing the actual unincumbered title. All of his acts appear to have been upon the assumption that the instrument executed by Cratty accomplished what it professed. Now, although Mrs. Mumma might have disavowed or repudiated the act of Cratty when she had knowledge of it, and that others were acting upon the faith of it, it was her duty to do so promptly; but, we have seen, instead of disavowing the act, she, through her agent, with full knowledge of it, soon after it was done, expressly ratified and affirmed it. After having done this, and lain by for several years, and the situation of the parties affected having meanwhile been materially changed, it is plain that it would not have been within her power to have revoked her ratification. This being so, then, could those who purchased under her with notice, occupy any better position? We think, clearly not.

The title to Mrs. Booth was obtained by her husband, Henry A. Booth. It is, indeed, questioned whether, in truth, the money which was used in buying up the Mumma judgment was not that of Booth, instead of his wife; but he says it was that of his wife, and for the present we shall so consider it. She, however, except through her husband, was not an actor. He did everything. So far as there was an attempt to derive title under the Criger judgment, it need only be said that Booth himself paid off that judgment before the attempt was made, and his counsel do not claim he could have got a title for his wife under that judgment. Mr. Johnson testifies, that when Booth was negotiating with Scott for the purchase of his interest in the property, Booth knew the

Mumma judgment had been postponed to the Miles trust deed,—that he knew it before he came to Johnson, and they talked with each other about it. He further says: "Some little time afterwards, he" (Booth) "got a kink into his head that he could beat that trust deed by that judgment. He told me the whole plan—to buy that judgment, sell the land in the name of the creditor, bid it in, let redemption go by, and defeat the mortgage. I told him he could not do it, and that it would be a rascally trick if he could do it. Subsequently I learned that he had gone on with the plan."

Cratty testifies: "There was a sale made of the land covered by the trust deed, on execution, in 1875, at Mr. Booth's instance, he having agreed with Mrs. Mumma as to the amount he would pay her. * * * He purchased the judgment for $200. It ran along so he paid interest on it making it $220, and she let him have the judgment, and the benefit of it. To get the full benefit of it, he desired to have the land sold on execution, which was done, and I bid it in in my name for $350, and turned the certificate of purchase over to him for $220, he paying the costs. The certificate was assigned to William Jack, at his request. He was acting for Booth, and I am not sure but he advanced the money. Booth and I consulted together. I do not pretend to give the language that passed. There were other judgments against Scott, and this trust deed against the land. The idea was, that he would have to redeem from this trust deed, and if the other judgment creditors redeemed from him he would get his money back, and not run much, if any, risk in buying the property upon this judgment upon this sale. He wanted it sold under the judgment so that others would have to redeem from him. Booth understood that the judgment was released as to the trust deed, and that he would have to redeem from the trust deed." Upon being asked whether "there was anything said in that conversation as to his making title under the Mumma judgment for the express purpose

of redeeming from the trust deed, and then compelling the other judgment creditors to redeem from him, so as to pay him the trust deed money, and the Mumma judgment, too," he answered: "That is my understanding of the interviews and conversations that we had. I was not aware that Mrs. Booth had any connection with the business, that I recollect of."

Jack testifies, that, acting as Booth's attorney, he made the arrangement with Cratty to have the land sold on the Mumma and Criger judgments; that he did it with the view of cutting off the lien of a judgment in favor of one Gibson, which had been confessed by Scott, perhaps on the same day that Scott conveyed to Booth. He further says, that the release of the Mumma judgment was known to himself and Booth long before that,—that it was frequently spoken of between them, and that it was never questioned.

Scott testifies, that Booth expressly undertook, in buying the land from him, to pay off the Miles trust deed.

Booth, in some respects, it is true, contradicts this evidence, and there may be other contradictory evidence; but we are clearly of opinion that the decided preponderance of the evidence shows that the purchase of the Mumma judgment, or the title under the Mumma judgment, was made with the understanding at the time that such judgment was postponed to the Miles trust deed. The money paid by Booth, and accepted by the agent of Mrs. Mumma, was upon that hypothesis. It is not, then, to be now tolerated that she shall say that such judgment was not postponed. The adequacy or character of the consideration for that postponement in nowise concerns her. As to her, it is as she contracted assuming it to be.

*Third*—Another ground of variance between the allegations and proofs insisted upon is, it is alleged in the bill that Cratty, as the agent of Booth, caused said execution to be levied on, etc., as the agent of Booth, whereas in this he

was acting as the attorney of Mrs. Mumma. We have seen what Cratty himself testifies to on this point, and also what is Jack's evidence. There is, we admit, controversy on the point, but we think the court below was warranted in finding that, although Cratty was the attorney of Mrs. Mumma in all that related to the collection of the judgment, still the acts of making the levy and purchasing the property were the acts of Booth, being done at his request, and to enable him to accomplish his ends. But we regard it of but little importance whether this view of the evidence be warranted or not. It is the fact that the sale of the property was made under the Mumma judgment after the lien of that judgment had been postponed to that of the Miles trust deed, that affords ground for equitable relief. Booth, knowing of that agreement, and purchasing with reference to it, could no more acquire a good title for his wife by purchasing a title from Mrs. Mumma, who is prohibited from acquiring title in the face of her ratification of the postponement, than he could by ordering execution, levy and sale, and then purchasing at the sale. Cratty had no right to act in this matter for either, and for which he acted is, therefore, unimportant.

*Fourth*—Another ground of variance between the allegations and the proof insisted upon is, the bill charges fraud as against the defendants, and there is no proof of fraud; and it is contended that there was an equity of redemption in Scott upon which the Mumma judgment was still a lien, and this might be lawfully sold upon execution on that judgment, and acquired by Mrs. Booth. This is, doubtless, true; but that interest was terminated, before Mrs. Booth got her deed, by the sale under the trust deed, and it is the asserting and setting up that title as against the title derived under the trust deed, and as a superior title to that derived under the trust deed, which is charged as fraudulent, and in the view we have hitherto taken of the evidence it is plain the setting up

and claiming the title derived at the sale under the Mumma execution, as a superior and paramount title to that derived under the Miles deed of trust, is, in legal contemplation, a fraud. No attempt was made to redeem from the Miles deed of trust by Mrs. Mumma, or those claiming under her, and at the time the sheriff deeded to Jack, and Jack deeded to Mrs. Booth, (January 20, 1879,) there remained no interest in Scott which could be passed or affected by those deeds. They conveyed no interest whatever in the property.

*Fifth*—The last ground upon which it is alleged there is a variance between the allegations and the proofs is, it is alleged in the bill that Booth assumed the payment of the indebtedness secured by the Miles trust deed as a part of the consideration for his purchase of Scott's interest in the lands in controversy, whereas the proof is that he simply bought Scott's interest in the property, assuming no liability whatever. It is admitted there is evidence tending to prove the allegation, but it is contended the preponderance is the other way. We might content ourselves by saying the court has passed upon this question, having evidence to warrant its finding, and we will not interfere; but waiving that view, since Booth was not sought to be, and was not personally, charged by the decree, what difference does it make how he acquired his title? His title was extinguished, as he virtually concedes, either by the sale under the trust deed or the sale under the Mumma execution, without regard to whether he did or did not assume the payment of that deed, and he does not attempt to set up title in himself, but in his wife, by virtue of another and distinct transaction. We therefore think the variance, even if it be conceded to exist, wholly immaterial.

The question next in order, as presented by the argument of plaintiff in error, is, does the case show any equitable ground of relief? He insists this is a mere effort to try titles in a court of equity which it is competent to try in a court of

8—102 ILL.

law, and he refers to authorities holding that there are only two cases under our law in which a party may file a bill to quiet title, or to remove a cloud from the title to real property,—first, where he is in possession of the lands, and second, where he claims to be the owner, and the lands in controversy are unimproved and unoccupied. *Hardin et al.* v. *Jones,* 86 Ill. 315; *Gage* v. *Abbott,* 99 id. 367. But this is the law where the object is purely to remove a cloud from a title, and does not affect cases where the primary relief is sought upon other and well established equitable grounds, and the removal of the cloud is prayed only as an incident to that relief. Thus, in *Kennedy et al.* v. *Northup et al.* 15 Ill. 148, the bill was filed for the purpose of setting aside certain deeds held by the defendants, which it was alleged were fraudulently obtained, and which remained as a cloud upon the complainants' title. It was objected that the defendants were in possession, which would enable the complainant to bring ejectment, and thus contest the fraudulent deeds in a court of law, and that hence a court of equity would not assume jurisdiction to try the validity of those deeds and set them aside. But the court held the objection untenable, and it was, in support of the ruling, among other things, said: "Where the simple question is as to which is the better legal title, the party should go to a court of law, if he is in a position to bring both titles before that tribunal. * * * The very *gist* of the complaint is, that the title under which the defendants claim was obtained by fraud, and if the fraud can not be established, the defendants' title must prevail. While a court of equity will not take jurisdiction of every case of fraud which may be presented, yet there are few questions over which its jurisdiction is more universal, and especially so when it relates to the transfer of real estate. The books are full of cases, presented in every conceivable form, in which courts of equity have assumed jurisdiction, and set aside conveyances fraudulently obtained."

See, also, *Comstock* v. *Henneberry*, 66 Ill. 212; *Moore* v. *Munn et al.* 69 id. 591. The present case was one peculiarly within the province of a court of equity.

The only remaining point to be noticed is, the decree is jointly against the defendants for the use and occupation of the premises, for $932.08. It is insisted there is no evidence showing that Mrs. Booth ever used or occupied the land. She refused to surrender possession when demand was made upon her for that purpose, and has interposed, by her answer, the claim that she is the lawful owner of the property. This claim, as has been seen, has no solid foundation, but the determination of its merits has principally caused the delay during which Wiley has been kept out of the property.

We see no cause to disturb the decree. It will, therefore, be affirmed.

*Decree affirmed.*